Good morning, Council. I can't hear you. I can't hear you. Turn your mic on. I still can't hear you. That would be a lawyer's nightmare. Your Honors, I'm not sure if you can hear me. This is Robert Tyler. I can't hear you, but I don't see you. I can't hear you. My is so. My associate is on the line and she is, her name is Neda Higuera and she's the one arguing today. We do see her, but we can't hear her. I can't hear you. And so, Gary, did you change this? The carbon deputy Trey, right? Did you change anything on your sentence when you came in earlier? You sounded fine. And I heard you when I checked you in. Do me a favor. If you take your mouse and you go next to where your microphone is on the bottom. Which is mule. Take the, you see the little arrow. Do you have multiple microphones? Okay. How about this? Whatever you did that work. Right. Thank you. Thank you. What a way to start an argument. You may proceed. Thank you, your honors. May it please the courts. My name is Neda Higuera and I represent the appellant and plaintiffs, James Stoneman and church United. This case is about the communications decency act. Also commonly known as section two 30. And this is a case of grave importance. And it's a case of grave importance because the outcome will determine if internet platforms, such as. As Amazon, Facebook, YouTube, and in this case, Vimeo can discriminate. Against a user and ban them from their platform. Based on intentional and unlawful sexual orientation and religious discrimination. James Stoneman and church United filed this lawsuit. Alleging that Vimeo. Discriminated against James Stoneman because of his perceived sexual orientation and religion. Now, whether or not that's true. Mr. Doman and church United were informed of Vimeo's policy. At the start of. Uploading their videos. Isn't that correct? That's correct. Your honor. Yes. And you take issue with the policy to begin with. You're saying they don't have the right. To have a policy that doesn't allow S O C E. Videos. No, your honor. We take issue with the fact that based on the allegations in the complaint, that Vimeo discriminated. Not against content, but against James Stoneman himself. And based on his sexual orientation. And that it wasn't a ban on content. It was a ban on these. Particular users and a permanent ban from any content. Okay. What is the basis for this allegation? That you make now just in front of us. What is the evidence? If any. Yes. So the standard based on the complaint is the facts have to   So the fact that they took. The entire library of 89 videos. And targeted domain and church United based on sexual orientation and religion. But they did target. Content. That was the nature of the agreement. That Mr. Dorman agreed to. When he uploaded his videos, they said they will not have. On their. On their platform. Any material regarding SOC. Which I'm just saying in. I abbreviated for him to speed this up. They said they wouldn't allow it. And he knew that when he signed up. What, what, what did they. What did he not understand? I don't know. The content is not, it's not an issue. If, for example, Vimeo would have deleted. Particular. Sexual orientation change effort content that, that that wouldn't be the case here. The case here is Vimeo banning sexual orientation change efforts. And the content is not targeted. Users. And church United. Then you don't dispute them that what he posted violated the terms of service that judge Pooler has been focusing on. Is that right? You're you're focusing on the, rather than just taking it down. On their decision to end his closest account. Is that correct? Yes. So close the account, delete 89 videos, most of which have nothing to do. With any sexual orientation change efforts and permanently ban these users from even posting a video about cookie baking, for example. So it's not the content. It is the,  And it is the, the conduct of Vimeo in targeting and discriminating against. James Doman and church United. Now, whether. So much attempt. Too far to propose another video. Not on this topic. Like baking cookies or anything like that. I'm sorry. They had 89 videos on their account that had most had nothing to do with, with. Sexual orientation change efforts. But they were. But the ones that were. Related to sexual orientation. I think we're going to save the whole phrase. We're a violation of the policy. To which Mr. Doman agreed. When he used. This platform. Isn't that correct? That is correct. But based on the allegations and the complaint. The allegations are intentional discrimination based on sexual orientation and religion. Now, whether or not that's true. Isn't at issue, whether. The plaintiffs appellants don't have to disprove Vimeo's contention that it's about content. They have to produce some evidence. Some even threat there. Evidence. Right. And we're a legend. And the complaint alleges disparate treatment and highlights specific, similar videos by other users, which were not deleted. The complaint alleges that Vimeo did not give domain an explanation of what content it took issue with. I thought it wasn't about content. I thought it was about his status because the section six of the terms of service specifically allow them. To take down all of the content. If they find that some of the content is, is in violation of their policies. Yes, your honor. So, so your client. Began using the website, knowing that if it had a dispute. With regard to some of its content, there was the possibility that all of its content might be removed from, from the website. But, but you, but it seems to me. The problem is, is that you're saying it's not about their content, but you really mean it is about the content because you're saying, because they asked the content to be taken down. They then threw us off the whole, because of that content, they threw us off the whole website. I don't understand. I mean, it. It seems to me you're really are arguing about the content. Aren't you? There was no ask to remove content or to remove specific videos. Well, they did. They identified, didn't they identify five videos? That they said were violated above of the SOC. And they, they did not give an opportunity for Vimeo to, to address content or take down that content. It was a. Does that require that? What was that? Your honor. Section six require that of the, of the terms and use. No, but that's part of. Our allegations of intentional discrimination. So we are looking at the legal conclusions of the allegations of intentional and lawful discrimination. And at the pleading stage, the allegations must be taken as true. And then the plea, we do allege that this was intentional and lawful discrimination. We allege disparate treatment. Those are, those are legal conclusions. I think we're asking, or I'm interested in knowing what specific allegations you have to back up those legal conclusions. We don't have to accept those. Yes, we do highlight specific videos that are similar in nature that were not taken down by Vimeo, which shows an inference, a minimum possible inference of discrimination. I think it's important to note that the, the plaintiffs have been given an opportunity to amend the complaint. If that was the issue, if it was the sufficiency of the allegations, but here the lower court decided and Vimeo contends that even if it is true, that, that there was intentional, a lawful discrimination that it's immune based on the CDA, particularly problematic is. So you also claim bad faith. Where is any allocation of bad faith? Where is the, where is the allegation of bad faith? Where is the evidence? The evidence of bad faith is in the fact that the, that the videos, the five videos that were allegedly problematic weren't targeted. It was the users that were permanently banned from a business service based on the discrimination. All right. I think we have your argument. You have reserved two minutes, one minute for rebuttal. We'll hear from Vimeo. Good morning. Your honors may please the court, Michael Chia, general counsel Vimeo. This is a case that is about content. Vimeo did not discriminate against anybody based on their religion, sexuality, or, or former sexual orientation. Vimeo made the editorial decision to remove discriminatory content from its website. And I want to refer to page five of the appellant's brief because this admission is made very clear here. They say, and this is at the last paragraph before section two here, liability is based on Vimeo, refusing to provide service to plaintiffs who published content on Vimeo's website. And we do not agree with Church United or Doman's content. And I want to emphasize the word content. And we, we agree with this. We do not agree with their content. We took a position against Sochi sexual orientation, change efforts content. We published that on our website for all to see well before Mr. Doman opened his account. When he uploaded after he uploaded account, we gave him notice, very specific notice that he had, he was hosting, he was publishing this content and that he had to remove it. And I think there was a question earlier is did, did Mr. Doman get notice of that? Of course he did. It's actually exhibit a to the complaint. He received a notice from Vimeo saying you have uploaded content in violation, our terms to it. So CE content, please take action immediately. We will review again. And if that content is not removed, you may lose your account. Well, what happened? He, I, you know, the entirety of the correspondence is not in the record, but he alleges that five videos were specifically identified. So we knew exactly which ones were at issue doesn't dispute now an appeal that these actually violated the terms and he doesn't do anything. 13 days go by. Vimeo moderator looks back at the account. Well, nothing's been done. No action has been taken. This is not only account that hosted a content that violated our terms. It is now a willful violation because he's refused to remove content after being put on specific notice. So at this point they do what most reasonable service providers do. They remove the entire count. 89 videos and all, and that, that is a reasonable exercise of a service providers discretion. Do you draw your support from either C1 or C2 of section 230? And would you discuss the difference? Yes. Yes. Thank you, your Honor. We draw our support from both sections of section two 30. So also the first amendment is focusing on section two 30, two 30 has two sections and they're both under the title, a good Samaritan protection for blocking and screening of offensive materials. And as judge Katzman wrote in the force case, they, they both combat the issue of content removal and content online in, in overlapping fashion. So there's no doubt here that these two, these two provisions interact with one another. The first one C1 is about publishing says you shall not treat the defendant as a publisher of another's information content. And the reason why that provision is in play is because to be a publisher is the status of being a publisher is to make decisions about whether or not to remove or publish content. It is inherent in the word publisher that we make a decision. And so it has to cover not only the affirmative act of publishing, but also the affirmative act of removing the force case. The use of C1 is a bit awkward to my mind. Wouldn't it be more useful if you were sued for keeping these videos online instead of removing them yourself through moderation? That is your honor. The quote unquote, typical case of section two 30 C1, the more paradigmatic case, the more recent cases on, on, on invoking section two 30 have all involved content removal. It's sort of a hot topic. And this is why this issue is coming up now. But it does not displace the use of section two 30 C1 in this manner to address content. Removal does not displace section two 30 C2. As judge Katzman said, two 30 C2 speaks more directly to the issue of content, but just because something might be a better fit doesn't mean that the other statutory section also doesn't apply. I mean, look, the first amendment also applies the, if you look, I think what, what, what you have to do is look back at the word publishing and does that include the, the, the act of removing? And I think it has to, especially based on the way the section two 30 came out, section two 30 is trying to reverse the Stratton Oakmont case. And what happens is to Stratton Oakmont is that a prodigy is held, treated as a publisher because it is removed certain content, but not all content. So the very act of removing content is what causes it to become a publisher in the first place. So therefore publisher has to be someone who not only publishes, but removes content. So that's why two 30. But the liability arose out of the fact that they made a decision to leave some stuff up. And, and so the question was, were they, were they analogous to a newspaper publisher? So the newspaper publisher repeats a slander becomes liable and the publisher by publishing it recreates it. It's a new tour. And every time it's republished the publisher itself under New York law acquires a liability. And so really, I mean, frankly, the original intent of the statute was protecting websites that were posting information from other people and, and not acquiring personal liability or corporate liability for the simple fact of posting it. I recognize the cases subsequently have said, well, there's a decision to post or not to post. And courts have said, well, the decision of not posting is also a function of publishing. And so therefore protected by the community. But in reality, the original focus was on the information that had been put up and was causing liability with regard to slanderous or libelous accusations. Right. To that, I would say your honor, that the focus was actually twofold. They want to, the Congress wanted to encourage, you know, free expression on the internet, but it also wanted to encourage the websites to self regulate. And so the main thing it did not like about the prodigy, the way Stratton Oakmont came out is that it creates a disincentive to, to moderate your site at all. In other words, it forces the provider to either do nothing and become like, like the, the CompuServe case, take a hands-off approach and let's become a distributor under common law. And then you just let up everything bad content, good content, or you take an overly restrictive approach to content moderation and you, you severely restrict speech and Congress wanted neither of those situations. And so content removal is quite, quite, quite pertinent to, to, to, to, to 30 C one. So with regard to content removal, as I understand your adversaries argument, she's saying that Vimeo was inconsistent in its practices with regard to content removal and that we should withdraw an inference that it was because of discriminatory reasons that it ended up closing this account rapidly and didn't take similar actions with regard to other users of its platform. What should we, if I'm understanding that correctly, what should we make of that? And she's looking to disparate treatment and asking us to infer discrimination. Yes. And this, and this, by the way, is only relevant to C2 because there is the modifier of, of good faith in that section. But the, the, the allegations of bad faith are as on the spectrum of non-existent to thread bear. They're, they're on the closer to non-existent. I mean, all you have is paragraph 45, the complaint, which lists seven videos, one of which is called gay to straight. One of which is called homosexuality is not allowed in the Quran. These prove nothing. These don't show that we discriminate against this guy based on, on his sexual orientation. These show that we have a range of videos on the site expressing different viewpoints. She argues that those videos would violate the policy under which they were removed from your platform. No, no, Your Honor. These, these, these don't prove anything. I mean, these don't prove these they're just based on the titles. You can't tell that these things violated any policy, but I would say that even going into this, this analysis, even trying to go into this analysis of saying, okay, there's some content on your site that you haven't removed. That's going to be true in every case involving a service provider. That's operating at scale. They alleged here that we host 90 million videos. Now it's actually five times that there's no way a YouTube, a video, a Vimeo, a Twitter can always be consistent a hundred percent in all the content that it hosts. And the whole point of section two 30 was, and this is made made in the force case. This point is that a service provider should not be held liable because it is not completely successful in its moderation efforts. So merely by engaging in this discussion and requiring us to go improve and all these unrelated cases that we are a hundred percent consistent in our, in our, in our content enforcement policies, that that itself is very problematic under, under section two 30. It is not what Congress wanted and what Congress wanted. It was focused on this specific case. Did they in this specific case exercise good faith as to section two 30 C2 and the evidence here, your honor is, is a hundred percent clear that we exercised more than good faith. We are very solicitous of Mr. Doman's rights. Cooler class. One more question, please. Justice Thomas recently wrote about the distinctions between C1 and C2. Does that bear on your liability here? I, what I read justice Thomas's concurring statement to, to, to, to be is really an exhortation to courts to make sure that they're following the text of the statute and not going too far awry on, on making policy decisions. But the text of the statute is very clear because of the word publishing in the statute.  used in the statute. If you look at section two 30 C1, which has to include the ability to, to remove content. And the reason why. There's one case is only one case in the entire federal system that has said, you know, reading two 30 C1 might render the two 30 C2 surplusage you have, it does not account for. You know, all the ways that section two 30 C1 still applies. Sorry. C2 applies when you interpret C1 in that way. Among other things. C1 covers only. You know, content. Not created by the service provider, whereas C2 covers any materials, regardless of the author. C1 would not cover a case where the defendant is being sued as a matter of fact,   So there's a very specific. Provision in C2 B for filtering software that appears nowhere in C1. So there's all kinds of ways. That C1. Sorry. You believe this. You answered my question. That both sections give you support. Yes. It's a long roundabout way of saying that. So yeah, yes, your honor. They, they both do. As does the, the first amendment. Okay. Thank you. We will end there and turn to counsel. For a Dolman you. Retained one minute for a bottle. Thank you, your honor. You hit on the most problematic aspect of this case, which is that an internet provider can delete and ban users for any reason whatsoever, whether there's good faith or not. And that is the, at the heart of this appeal, because that would have great consequences. And the difference in language and C1 and C2 is clear and it's meaningful. And C2 says that an internet provider is not liable for restricting access or availability of materials that specifically relates to removing content. And as opposed to C1, where you're treating an internet platform as a publisher or speaker of information. And so under the reading that the same deletion of an account is both immune under C1 and C2. Well, why would we even need C2 and the good faith requirement? And as justice Thomas mentioned that a reading that conflates the two sections will result in protecting companies who quote racially discriminate and removing content. And that's the biggest issue in this case. Thank you. Thank you counsel. Thank you both for very good argument. Thank you. We'll reserve decision. Thank you.